## DUNFEE v. TERWILLIGER.

(Circuit Court of Appeals, Ninth Circuit. November 8, 1926.)

No. 4887.

1. **Trusts** ⊚⇒102(1)—**One in fiduciary relation with lessee, securing renewal of lease to himself, holds new lease in trust for original lessee.**

In equity, ordinary expectancy of renewal of lease is valuable interest, and, if one in fiduciary relation to lessee secures renewal to himself, equity will treat him as holding lease in trust for original lessee.

2. **Mines and minerals** ⊚⇒104.

One of principal stockholders in mining corporation could not secretly take lease on mining property to himself at expense of corporation and his associates.

3. **Mines and minerals** ⊚⇒104—**Lease of mine taken in his own name by one of two stockholders, after expiration of lease to corporation, held not to inure to benefit of corporation.**

Where D., one of two principal stockholders in mining corporation, closed mine 18 months before expiration of lease at other's request, because of differences and loss, and thereafter lessor's mining machinery was stolen and timbering fell into decay, *held*, that new lease, taken by D. in own name after he renewed explorations at his own expense on lessor's request, and after original lease expired, did not in view of other stockholders' conduct, inure to benefit of corporation.

Appeal from the District Court of the United States for the District of Nevada; Edward S. Farrington, Judge.

Suit by C. A. Terwilliger, on behalf of himself and all other stockholders of the Orleans Mining & Milling Company similarly situated, against J. W. Dunfee. Decree for plaintiffs, and defendant appeals. Reversed and remanded, with directions.

The appellant for more than a year had been operating a developed and producing mine under a lease from the owner thereof, when in September, 1916, he entered into a contract with the appellee, Terwilliger, wherein it was agreed that, in consideration of the appellant assigning his lease to a corporation to be formed and the equal division of the promotion stock of said corporation between him and said Terwilliger, the latter would ob-

tain $8,000 by sale of a portion of his stock and pay $3,000 thereof to the appellant, and $5,000 into the treasury of the corporation. The contract contained this provision: "It is further agreed that, should it be deemed advisable, after the full $8,000 is raised, to raise more money for development, the stock so sold shall be taken share for share from the holdings of J. W. Dunfee and C. A. Terwilliger, respectively."

The corporation was organized, and mining operations were carried on thereunder until November, 1918, when at Terwilliger's request the mine was closed down and the corporation ceased to function, and thereafter did no work upon the mining property. The mining machinery, which belonged to the lessor, was permitted to be stolen, and the timbering was permitted to fall into decay. The lease required by its terms the performance of work of at least 60 shifts of one man during each month, and provided for forfeiture for failure to perform such work. The term of the lease expired on June 1, 1920, more than 18 months after the cessation of work on the mining property. On June 5, 1920, the appellant took a lease in his own name and endeavored to operate thereunder, but became discouraged, and in October, 1920, he surrendered it. In January, 1921, the owner's agent endeavored to induce the appellant to consent to a lease on more liberal royalty terms than theretofore provided, but he refused to accept it on the ground of his financial inability to perform the stipulated 60 shifts per month.

The agent thereafter persuaded him to explore the ground, with the understanding that, if he discovered ore in sufficient quantity, he could have a lease dated back to January 1, 1921. In pursuance of that offer he expended considerable sums of money, incurred debt, and performed labor until in March, 1921, he made a discovery which justified him in seeking and obtaining a lease, which was executed and dated as of January 1, 1921. In July of that year he sold the lease to a purchaser for $40,000 cash and 150,000 shares of stock of a corporation, the Orleans Hornsilver Mining Company, to be formed by the purchaser. The appellees, on hearing of the sale, served upon the appellant and the new corporation a notice asserting title to the consideration received for said sale.

In April, 1922, the appellees brought a suit alleging that the appellant fraudulently and secretly negotiated to obtain from the owner of said mining property the lease of June 5, 1920, and the lease of January 1, 1921, and praying that the latter lease be decreed to be the sole property of the Orleans Mining & Milling Company, and that the appellant be held to have obtained the same as trustee for the benefit of said corporation. On the issues and the evidence the court below found that the appellant received the 150,000 shares of stock in the Orleans Hornsilver Mining Company as trustee for the appellees, and decreed that he surrender the same, not to the Orleans Mining & Milling Company, but to the appellees herein, together with the $40,000 so paid to him on account of the purchase price of said lease.

Augustus Tilden, of Ocean Beach, Cal., and John F. Kunz, of Reno, Nev., for appellant.

H. R. Cooke, of Reno, Nev. (Cooke & Stoddard, of Reno, Nev., on the brief), for appellee.

Before GILBERT and RUDKIN, Circuit Judges, and NETERER, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). [1] The ordinary expectancy of a renewal of a lease is regarded in equity as a valuable interest, and, if one who stands in a fiduciary relation to a person entitled to such beneficial interest secures a renewal to himself, a court of equity will treat him as holding the new lease in trust for the persons entitled to the beneficial interest in the original lease. This rule is well settled, and is accepted in both English and American courts. Holt v. Holt, 1 Chan. Cas. 190; Phyfe v. Wardell, 5 Paige (N. Y.) 268, 28 Am. Dec. 430.

[2] As applied to the present case, the rule amounts to this: The appellant herein may not secretly or clandestinely take a lease on the mining property to himself, at the expense of those who became associated with him under his agreement with the appellee; that is to say, he cannot secretly or inequitably obtain for himself a lease to which all of his associates were equally entitled. In Chittenden v. Witbeck, 50 Mich. 401, 15 N. W. 526. Judge Cooley expressed the principle here applicable: "But the pivotal fact on which all such cases turn is that there has been underhand and secret dealing by one of the partners in fraud of the other, whereby he has obtained a special advantage to himself during the continuance of the partnership, which fair dealing required that he should have taken for the benefit of the firm; and equity takes notice of the fraud and declares him trustee for the firm."

As applied to the facts in that case the court said it was not understood or expected "that one shall put his property and responsi-

bility at stake upon the results of the business, and that the others shall share in the profits while escaping responsibility for the losses. But this is what in effect is demanded of this complainant. It is insisted that he shall take a lease, in which he will be sole lessee and solely responsible for all the contingencies of depreciation and loss, and that at the same time he shall account to another, who incurs no risk and no responsibility, for some share in the anticipated but altogether contingent profits."

In Marks v. Merrill Paper Mfg. Co. (C. C.) 188 F. 850, where a corporation was insolvent and doing a losing business, and its stockholders were unwilling to furnish additional capital, and a new corporation of certain of its stockholders purchased the company's equity in mortgaged property, pursuant to a plan whereby all of the stockholders of the old company might become stockholders of the new, it was held that the majority stockholders had not obtained any unfair advantage over the minority.

In Tygart v. Wilson, 39 App. Div. 58, 56 N. Y. S. 828, the court said: "It would be unreasonable to hold that, after the dissolution of a copartnership, or the fixing of a time when it is to be dissolved, neither member of such copartnership should be at liberty to lease the premises theretofore occupied by them for his own benefit, but could only take it for the joint benefit of those who were no longer to continue in the business. The sum and substance of the principle is that a partner shall not secretly or clandestinely take advantage of his position to better himself at the expense of his associates; that he shall not, as some cases express it, 'go behind the back' of his copartner to obtain that, solely for himself, to which all of his associates are equally entitled."

In Green v. Hall (Tex. Com. App.) 228 S. W. 183, it was held that the general manager of a company, which had a lease which was about to be forfeited for nonperformance of its terms, might individually take a new lease, free from any interest of the others interested with him in the former lease, so long as the lease was forfeited, not for any fault of his, but owing to the company's inability to finance the enterprise.

[3] As we view the law applicable to the undisputed facts in the present case, we are unable to assent to the conclusion reached by the court below. We find no evidence of fraud or concealment upon the part of the appellant. The evidence shows that for a period of two years he endeavored faithfully to operate the mining property successfully and carry out his contract with Terwilliger. Differences arose concerning the management. "On September 30, 1918," Terwilliger testified, "I wrote him, and told him that my advice to him would be to close down the property immediately, because we were not realizing a dollar on it, and I thought the property could be financed much easier with lots of ore in sight than it would be to work the property out."

Terwilliger advocated the sale of treasury stock to raise funds for further operations. The appellant insisted upon compliance with the terms of the contract, which required each party thereto to contribute from his respective personal stock for future financing. Operations thereupon ceased at Terwilliger's request. On March 26, 1920, two months before the expiration of the lease, the appellant wrote to Terwilliger: "If I can secure a 2½-year lease and option, * * * which I believe I can, do you think you could take the old company and get the money by selling stock to work it? * * * Wire or write me what you are willing to try and do, or which you think could be done; the inducements are better now than ever before." Thirty-six days later Terwilliger replied: "When will you be in Los Angeles to confer with me regarding this matter of the Orleans property? I would not attempt to do any business through the mail, as I consider it would be time wasted." Upon the back of the appellant's letter he wrote the following: "Ansd. Mch 30/20 and stated would not raise any money on the old line, and would not make any agreement about this matter by letter or wiring. Told him to come to Los Angeles and we would go into the matter in detail and come to some understanding for financing."

There was no further communication between the two. Terwilliger remained thereafter at Los Angeles, more than 400 miles distant from the mining property, and the appellant heard nothing further from any of the appellees, and but for the fact that he subsequently made discovery of paying ore it is reasonable to assume that he would never have heard from them. Terwilliger testified that he never expressed a desire to have the lease extended; that he never made inquiry as to what the appellant did after the correspondence ceased, and never knew that he had obtained a lease of the property until about July 15, 1921, when he heard of the sale thereof; that he knew that the original lease would expire by its terms on May 31, 1920, and that he had no reason to think that any work was going on at the mine thereafter. He testified that he thought he would eventually hear

something from the appellant, because "I was fifty-fifty in the property. Q. Your idea was, if he ever in the future got an interest in the Orleans, then you would spring your fifty-fifty interest on him? A. Yes, sir."

When on June 1, 1920, the lease of the mining property expired, the expectancy of its renewal had no discernible value, for the lessees had no right or equity to demand or expect a renewal in the face of the fact that the mining property had lain idle for 19 months, the lessor's machinery had been stolen, the stopes had fallen in, and no disposition had been shown to resume mining operations. Nor after the expiration of the term, of the lease was the appellant under any obligation to devote his time to the service of the appellees, or to carrying out his contract with Terwilliger. During the preceding 19 months he had without objection from the appellees given his attention exclusively to his private interests elsewhere. We cannot see where at any point he failed in his duty to the appellees, or did them an injury, or took from them a property right.

The decree is reversed, and the cause is remanded, with instructions to dismiss the bill.