William L. KAUFFMAN, Appellant,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Appellee.

No. 06–CV–1198.

District of Columbia Court of Appeals.

Argued May 16, 2008.

Decided June 12, 2008.

Richard L. Thompson, II, La Plata, MD, for appellant.

William R. Wilder, Washington, DC, for appellee.

Before WASHINGTON, Chief Judge, and FARRELL and GLICKMAN, Associate Judges.

FARRELL, Associate Judge:

Kauffman sued his employer, International Brotherhood of Teamsters (hereafter IBT), in Superior Court for breach of an agreement to provide him with a monthly housing allowance. IBT had paid Kauffman the allowance starting in 1993, but in April 1996 discontinued it, prompting this suit. IBT defended by arguing in part that, as an at-will employee, Kauffman had impliedly agreed to elimination of the housing allowance by remaining an employee of IBT for years (namely, three) after the change took effect with his knowledge. The trial court, implicitly relying on our decision in *National Rifle Ass'n v. Ailes*, 428 A.2d 816 (D.C.1981), granted summary judgment to IBT. We affirm.

## I.

Beginning in 1992, Kauffman took a leave of absence from his job with United Parcel Service in New Jersey to become an International Representative for IBT. IBT did not specify a period of time during which Kauffman would be employed by IBT, and his leave from UPS was to be active "as long as [he] wanted."[1] IBT's constitution provided that the General President could remove an International Representative "when he deems it for the best interests of the International Union." In 1993, Mario Perrucci, an IBT representative, asked Kauffman to relocate to Washington, D.C. Perrucci agreed that IBT would compensate Kauffman to offset the higher cost of living in Washington. Specifically, IBT offered to reimburse his housing expenses, and Kauffman accepted this offer as a condition of his agreement to relocate. Kauffman maintained his home in New Jersey as his permanent residence and obtained an apartment in Washington. IBT reimbursed him for his housing expenses in Washington until late 1994.

On December 15, 1994, IBT changed its policy somewhat and decided to pay Kauffman a monthly housing allowance of one thousand dollars, which would be included in the last paycheck of each month to cover expenses for the following month. In 1994, Kauffman still owned his home in New Jersey, but spent all of his time in Washington because of his assignment and because he and his wife had divorced. On July 29, 1995, Kauffman requested that IBT change his permanent address to a residence in Arlington, Virginia.

Around April 9, 1996, Kauffman received a memorandum from Howard Edwards, Director of Human Resources for IBT, notifying him that he "no longer qual-iff[ied]" for the housing allowance because he had relocated his permanent residence to the Washington, D.C. area (*i.e.*, he would no longer be forced to maintain two residences), and that the allowance would be discontinued effective April 1.[2] The memorandum instructed him to contact Edwards if he had questions. Kauffman requested to meet with Aaron Belk, who was "party to the discussion and the agreement," but never obtained a meeting. Kauffman spoke to Edwards, who "reemphasized what the memo said." Kauffman also raised the issue in a meeting with a director and the office staff and sent memoranda. He understood, nevertheless, that IBT was no longer going to pay the housing allowance. IBT never changed its position and did not pay the allowance after April 1996. Kauffman sued in Superior Court on March 29, 1999, and IBT terminated his employment the next day.[3]

## II.

Kauffman does not challenge his discharge as an employee by IBT in 1999.

---

1. Although Kauffman alleged in his complaint that his appointment was "[i]n accordance with the collective bargaining agreement between UPS and [IBT]," Kauffman produced no evidence of these agreements.

2. Since the allowance for April would have been paid on March 31, 1996, it would not be affected by the April 1 effective date. Kauffman conceded at oral argument that the change had only prospective effect.

3. After Kauffman filed his suit, IBT moved unsuccessfully for judgment on the pleadings, *see* Super. Ct. Civ. R. 12(c), then moved for summary judgment at the close of discovery. The trial court denied the motion and subsequently granted the parties' joint motion to stay further proceedings pending the outcome of a suit Kauffman had filed meanwhile in federal court. See note 4, *infra*. After that suit was resolved, IBT successfully renewed its motion for summary judgment in Superior Court, giving rise to this appeal.

He does not, that is, dispute the fact that he was an "at-will" employee of IBT, a relationship "terminable . . . by either party at any time." *Nickens v. Labor Agency of Metro. Washington,* 600 A.2d 813, 816 (D.C.1991).[4] Kauffman sued IBT instead on the theory that his at-will status did not bar him from suing his employer for breach of a "subsidiary agreement" (Br. for App. at 14), namely, IBT's promise to pay him a housing allowance for the duration of his employment in Washington. Kauffman argues that IBT's action in terminating this allowance in April 1996 was a "unilateral change" of this agreement for which "there was [no] consideration" (*id.* at 12), and thus was a breach of contract. We agree with the trial court that settled law, beginning with our decision in *National Rifle Ass'n v. Ailes, supra,* refutes this claim.

In *Ailes* a number of employees who had been discharged as part of a reduction-in-force sued to recover monetary compensation for unused leave they had accrued in excess of a 225–hour limit that NRA had imposed by a policy change made during their employment. On the employer's appeal from an adverse jury verdict, this court agreed with the plaintiffs that, "as a general rule, an employee who accrues but does not take . . . paid leave is entitled to monetary compensation for that leave upon discharge . . . absent an agreement to the contrary." *Ailes,* 428 A.2d at 820.

We held, however, that "once an employee learns about a new [employer] policy limiting compensation for unused leave upon termination, but elects to stay on the job and accept compensation, that decision is sufficient to imply an agreement to continue working subject to the new limitation." *Id.* at 822. This "implicit[ ]" or imputed agreement to a change, we said, required proof that the employee's "knowledge of the change was complete enough" to support an inference that his "decision to remain on the job was premised on acceptance of the new policy," *id.,* and further required proof that he had been given "at least a brief period of time" to "remain on the job without prejudice"—*i.e.,* without having "impl[iedly] acquiesce[d]" in the change—while considering whether to accept the change or leave the employment. *Id.* at 822, 823. Applying these standards to the facts at hand, we sustained the jury's finding as to certain of the employees that there was an inadequate basis "for imputing [to them] a belief that the [225–hour policy] limit applied to them," *id.* at 824, but as to others, whose awareness of the change and its application to them was undisputed, we held that they "must be said as a matter of law to have agreed to that limitation." *Id.* at 825.

*Ailes* did not expressly confine itself to agreement by at-will employees, though we think that is its clear implication.[5] So

---

4. *See, e.g.,* Br. for App. at 11 ("Analysis of the instant case . . . is not altered when one adds the fact of Appellant's at will status."). Kauffman's at-will status was, in any event, established conclusively in the related suit he brought in federal district court, *see Kauffman v. International Bhd. of Teamsters, AFL–CIO,* Civ. Act. No. 01–1104 (D.D.C.) (Order of May 24, 2005), a decision he did not appeal. *See, e.g., Smith v. Jenkins,* 562 A.2d 610, 617 (D.C. 1989) (collateral estoppel or issue preclusion barred relitigation of an issue previously decided by a court of competent jurisdiction); *Williams v. Mount Jezreel Baptist Church,* 589

A.2d 901, 906 (D.C.1991) (*res judicata* or claim preclusion barred relitigation in Superior Court of claim decided in federal district court and not challenged by direct appeal).

5. In *Dahl v. Brunswick Corp.,* 277 Md. 471, 356 A.2d 221 (1976), for example, on which *Ailes* relied, the court noted that whatever rights the affected employees had were not derived from "written employment contracts [or] a collective bargaining agreement" but rather from written policy standards of the employer governing matters such as severance and vacation pay. *Id.* at 223.

viewed, the principle *Ailes* established for this jurisdiction is in keeping with the rule adopted by most courts considering the issue that an employer may prospectively modify the terms of at-will employment and that the employee's continued service amounts to acceptance of the modification. *See Cotter v. Desert Palace, Inc.,* 880 F.2d 1142, 1145 (9th Cir.1989); *Martin v. Airborne Express,* 16 F.Supp.2d 623, 632 (E.D.N.C.1996); *Martin v. Golden Corral Corp.,* 601 So.2d 1316, 1317 (Fla.Dist.Ct. App.1992); *Moody v. Bogue,* 310 N.W.2d 655, 660–61 (Iowa Ct.App.1981); *Stieber v. Journal Publ'g Co.,* 120 N.M. 270, 901 P.2d 201, 204 (Ct.App.1995); *Albrant v. Sterling Furniture Co.,* 85 Or.App. 272, 736 P.2d 201, 203 (1987); *In re Dillard Dep't Stores, Inc.,* 198 S.W.3d 778, 780 (Tex.2006); *Hathaway v. General Mills, Inc.,* 711 S.W.2d 227, 229 (Tex.1986); *see also* Thomas G. Fischer, *Sufficiency of Notice of Modification in Terms of Compensation of At–Will Employee Who Continues Performance to Bind Employee,* 69 A.L.R.4th 1145, 1147 (1989). These courts hold that the ability to terminate the employment relationship at will necessarily includes the ability to alter its terms, and that permitting such modification avoids the undesirable result of encouraging employers to fire employees who do not expressly agree to new terms. *See, e.g., Cotter,* 880 F.2d at 1145; *Stieber,* 901 P.2d at 204.

■ Contrary to Kauffman's argument, contract modifications in this context are not unilateral and without consideration. Rather, unlike employment contracts for a fixed duration, neither party to at-will employment is bound to continue performance, and thus courts properly view future performance by each as valid consideration for the change in terms. *See Curtis 1000, Inc. v. Suess,* 24 F.3d 941, 947 (7th Cir. 1994) ("In the case of employment at will

... continued employment for a substantial period is good consideration for the [new] covenant."); *Schoppert v. CCTC Int'l, Inc.,* 972 F.Supp. 444, 447–48 (N.D.Ill.1997); *Martin v. Airborne Express,* 16 F.Supp.2d at 632; *DiGiacinto v. Ameriko–Omserv Corp.,* 59 Cal.App.4th 629, 69 Cal.Rptr.2d 300, 305 (1997). As the court observed in *Curtis 1000, Inc., supra,* a contrary view "refus[ing] to regard continued employment as consideration" for a change imposed during the employment would only induce employers to fire employees "and rehire them the following day" under the changed term of employment. 24 F.3d at 947. This body of law, as we have seen, is consistent with and reinforces our own analysis in *Ailes, supra.*

■ In his deposition, Kauffman admitted that he knew IBT would no longer pay the housing allowance beginning in 1996, and yet he continued the employment for three more years—by any measure "a reasonable period during which" to consider his "personal alternatives," *i.e.,* "whether to resign ... or to remain with [IBT]." *Ailes,* 428 A.2d at 823, 825. His argument that he "attempted to challenge the termination" throughout this period (Br. for App. at 11) is unavailing. The agreement or acquiescence *Ailes* found in similar circumstances is "impl[ied]" or "impute[d]," 428 A.2d at 822, 824; it does not depend on willing acceptance. As we explained in *Ailes,* after "at least a brief period of time" in which "to evaluate his ... options," the at-will employee is "deemed as a matter of law" to have accepted a known change by continuing in the job. *Id.* at 822, 823, 826. *See also DiGiacinto,* 69 Cal.Rptr.2d at 305 ("Presumably, under [the majority] approach, it would not be legally relevant if the employee also had complained, objected, or expressed disagreement."); *Moody,* 310 N.W.2d at 660–61 (at-will employee's "decision to continue work, knowing the newly proposed terms, results in the em-

ployee's acceptance as a matter of law"); *Geary v. Telular Corp.*, 341 Ill.App.3d 694, 275 Ill.Dec. 648, 793 N.E.2d 128, 130, 133 (2003) (same result despite fact that employee had "verbally objected to the change"); *Schoppert*, 972 F.Supp. at 448–49 (finding agreement to change that both parties understood was "a done deal" where the employee kept working for two years while accepting compensation under its new terms).[6]

■ Kauffman cites decisions recognizing the right of at-will employees to sue for breach of a subsidiary agreement, say, to pay accrued commissions or bonuses. *See, e.g., Smith v. Chase Group, Inc.*, 354 F.3d 801 (8th Cir.2004); *Terrell v. Uniscribe Prof'l Servs., Inc.*, 348 F.Supp.2d 890 (N.D.Ohio 2004). Those decisions, however, do not deal with the situation here and in *Ailes*—as well as in the other cases we have cited—because none involved a change in terms of employment of an at-will employee who continues in the job with knowledge of the modification. As we recognized in *Ailes*, absent a modification of employment terms during the employment, an employee upon termination is entitled to monetary compensation for benefits accrued under those terms. *See* 428

A.2d at 820. It is worth noting, moreover, that IBT's modification operated only prospectively and did not seek to recoup any "accrued" housing payments to Kauffman.

■ As an alternative to his breach of contract claim, Kauffman invokes the doctrine of promissory estoppel, but to the extent he explains its application here at all,[7] it appears merely to restate his breach of contract claim in other dress. Kauffman cites no promise on which he relied to his detriment other than the same term IBT was free to modify with his consent—a consent implied from his continuing to work for IBT as an at-will employee. (He does not claim, for example, that IBT induced him to move to Washington *permanently*, such that he incurred costs he could not meet through his salary and his savings in no longer having to keep a second, New Jersey home.) Kauffman, in short, offers no reason why rejection of his breach of contract claim under the principles we have discussed results in an "injustice." *Bender, supra* note 7.

■ Finally, we reject Kauffman's argument that the law of the case doctrine prevented the trial judge from granting IBT's motion for summary judgment. More than once this court has cited the

---

6. Of course, if the employer's notice of change required the employee's acceptance by signature, *see Schoppert*, 972 F.Supp. at 449, or evidence suggested the parties could still negotiate the terms of the change, *see Knowlton v. Viktron Ltd. P'ship*, 994 F.Supp. 128, 132 (E.D.N.Y.1998), the employee could not be deemed to have accepted it merely by continuing to work. In the words of *Ailes*, his "knowledge of the change" in those circumstances would not be "complete enough" to support the inference that his "decision to remain on the job was premised on acceptance of the new policy." 428 A.2d at 822. Here, IBT's discontinuance of the allowance was not conditional on Kauffman's express acceptance, and despite his objections IBT never changed its position or suggested that the matter was open to negotiation.

7. For promissory estoppel to lie, "there must be evidence of a promise, the promise must reasonably induce reliance upon it, and the promise must be relied upon to the detriment of the promisee." *Simard v. Resolution Trust Corp.*, 639 A.2d 540, 552 (D.C.1994). Further, the theory may be invoked only when "injustice otherwise [would] not [be] avoidable." *Bender v. Design Store Corp.*, 404 A.2d 194, 196 (D.C.1979). Kauffman's complaint did not mention promissory estoppel, and although he more than once stated in his trial court papers that he would move to amend the complaint to add that count, he did not do so. Nevertheless, the theory was mentioned in the parties' motions for, and oppositions to, summary judgment, and we address it briefly here.

principle that "we cannot be expected to reverse a correct decision by one [trial] judge simply because we find it contrary to a prior ruling by another [trial] judge in the same case, *i.e.,* contrary to the law of the case." *Williams v. Paul,* 945 A.2d 607, 611 n. 4 (D.C.2008) (alteration in original) (quoting *Guilford Transp. Indus., Inc. v. Wilner,* 760 A.2d 580, 593 (D.C.2000)); *but see Kritsidimas v. Sheskin,* 411 A.2d 370, 371–72 (D.C.1980). In any event, Kauffman's reliance on the earlier denial of summary judgment, see note 3, *supra,* is unavailing because at the time of the first motion his employment status with IBT— at-will or something more—was a material issue of fact in dispute. Once that issue was resolved in the federal action, see note 4, *supra,* IBT was free to renew its motion for summary judgment citing that material change in the record. *See Williams v. Mount Jezreel Baptist Church, supra* note 4, 589 A.2d at 907; *Gordon v. Raven Systems & Research, Inc.,* 462 A.2d 10, 13 (D.C.1983).

Accordingly, the judgment of the Superior Court is

*Affirmed.*